IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-03352-STV

LARRY GILE, JR.,

    Plaintiff,

v.

DENVER PUBLIC SCHOOLS,

    Defendant.

## ORDER

Entered By Magistrate Judge Scott T. Varholak

This civil action is before the Court on Defendant's Motion to Dismiss [#21] (the "Motion"). The parties have consented to proceed before the undersigned United States Magistrate Judge for all proceedings, including entry of a final judgment. [##10, 11] This Court has carefully considered the Motion and related briefing, the entire case file, and the applicable case law, and has determined that oral argument would not materially assist in the disposition of the Motion. For the following reasons, the Motion is **GRANTED IN PART** and **DENIED IN PART**.

I.    **BACKGROUND**[1]

Plaintiff has autism spectrum disorder ("ASD") and complex partial epilepsy. [#17 at ¶ 7] These disabilities limit Plaintiff's ability to communicate with others and navigate

---

[1] The facts are drawn from the allegations in Plaintiff's Amended Complaint (the "Complaint") [#17], which must be taken as true when considering a motion to dismiss. *Wilson v. Montano*, 715 F.3d 847, 850 n.1 (10th Cir. 2013) (citing *Brown v. Montoya*, 662 F.3d 1152, 1162 (10th Cir. 2011)).

social situations. [*Id.* at ¶ 8] They also substantially limit the functions of his brain and neurological systems. [*Id.*]

In October of 2020, Plaintiff began as a teacher at Hamilton Middle School ("Hamilton"), a school within the Denver Public School District ("DPS"). [*Id.* at ¶ 9] DPS was aware of Plaintiff's diagnoses when it hired Plaintiff. [*Id.* at ¶¶ 10-11] Plaintiff's first year as a teacher went well and he received satisfactory reviews. [*Id.* at ¶ 12]

On October 7, 2021, however, Rachel Langburg, Hamilton's assistant principal, approached Plaintiff and told him that a few students had called him a pedophile. [*Id.* at ¶ 15] That afternoon, Plaintiff met with Ms. Langburg and Elizabeth Doyle, one of Hamilton's Denver Classroom Teachers Association ("DCTA") representatives. [*Id.* at ¶ 17] Ms. Langburg assured Plaintiff and Ms. Doyle that everything had been cleared up and that Plaintiff was approved to come back to school the next day. [*Id.*]

The next day, Plaintiff arrived at school and taught his morning classes. [*Id.* at ¶ 18] During lunch, Ms. Langburg asked Plaintiff to come to the principal's office with her. [*Id.*] Ana Mendoza (Hamilton's interim-principal), Melissa Harmon (a human resources partner at DPS), and Amber Shearer (another Hamilton assistant principal) were all present when Plaintiff arrived at the office. [*Id.*] At the office, Plaintiff was told about a petition that a student in his class had written alleging that many female students felt uncomfortable by Plaintiff's actions and behaviors. [*Id.* at ¶¶ 19-20] These actions and behaviors allegedly included staring at female students' chests and favoring female students over male students. [*Id.* at ¶ 20] Seven students commenting on the petition made similar allegations. [*Id.* at ¶ 21] Plaintiff was then told that he was being placed on administrative leave, effective immediately. [*Id.* at ¶ 22]

On October 28, 2021, Plaintiff received notice that an investigation into the allegations against him concluded that the allegations were unfounded and that Plaintiff would be expected to return to work on November 1. [*Id.* at ¶ 25] The next day, Plaintiff's counsel sent a request for accommodations letter ("RFA Letter") to DPS's in-house counsel stating that students had engaged in a vicious campaign against Plaintiff due to his Autism. [*Id.* at ¶¶ 26-27] The letter requested the following accommodations: (1) Plaintiff should be permitted to leave early on November 1 to attend a medical appointment; (2) DPS should allow Plaintiff to meet with a human resource officer with his attorney present before requiring Plaintiff to return to the classroom to teach; (3) DPS should provide Plaintiff at least two days to prepare lesson plans and get reoriented to his students' progress before returning to the classroom; (4) DPS should explain to Plaintiff the steps it took to ensure that students do not belittle and harass Plaintiff when he returns to the classroom; (5) DPS should remove the student who created the petition from Plaintiff's classroom and refer that student to the disciplinary office for expulsion and to the police; (6) DPS should discipline and remove the additional seven students who commented on the petition from Plaintiff's classroom; (7) DPS should provide information on the expectations it set with respect to the students involved in the petition; (8) DPS should provide information on whether or not any communications were sent to the Hamilton community regarding Plaintiff's leave and provide information about what communications would be sent to the community stating that the allegations were baseless and slanderous; (9) DPS should create a protocol moving forward if students continue to perpetuate the lies stated in the petition and provide information to Plaintiff

about his ability to advocate for himself in the future; and (10) DPS should not hold Plaintiff responsible for grading any student work collected while he was on leave.  [*Id.* at ¶ 27]

According to the Complaint, the District's discipline matrix specifically authorizes discipline for school behavior or misconduct that substantially disrupts the school environment.  [*Id.* at ¶ 30]  Further, DPS routinely moves students from one teacher's class to another teacher's class for a variety of reasons, including conflict between teachers and students.  [*Id.* at ¶ 32]  DPS had multiple teachers who taught the same subject matter as Plaintiff.  [*Id.* at ¶ 33]

On November 1, 2021, Brent Jordheim, Deputy General Counsel for DPS, responded to the RFA Letter.  [*Id.* at ¶ 34]  Mr. Jordheim wrote that DPS was unable to take any disciplinary action against the students involved in the petition.  [*Id.* at ¶ 35]  He further wrote that Dr. Wes Montoya, Hamilton's new interim-principal, was best positioned to address any school operational issues, including classroom management and grading.  [*Id.* at ¶ 36]  Finally, Mr. Jordheim wrote that Kim Crouch, the District's Americans with Disabilities Act ("ADA") coordinator, had provided Plaintiff with a medical certification form and that Ms. Crouch would engage with Plaintiff about ADA accommodations once Plaintiff completed that form.  [*Id.*]  Though not addressed in the letter, DPS did not remove any of the students from Plaintiff's classroom.  [*Id.* at ¶ 37]

The same day that Mr. Jordheim sent his letter, Plaintiff returned to work but did not teach.  [*Id.* at ¶ 44]  Instead, Dr. Montoya and Plaintiff agreed that Plaintiff would spend his first week lesson planning and grading.  [*Id.*]  Nonetheless, because DPS had not disciplined or removed the accusing students from his classroom, Plaintiff "experienced crippling fear and anxiety that any of his actions would be misconstrued and

4

manipulated by students and that he would again be the target of false, slanderous allegations." [*Id.* at ¶ 45]  Triggered by the stress, on November 2, 2021, Plaintiff suffered a seizure at home.  [*Id.* at ¶ 46]  Two days later, he suffered another seizure, this time at work.  [*Id.* at 47]

On November 5, 2021, while at work, Plaintiff could barely move from his chair and recognized that he would be unable to teach the following week.  [*Id.* at ¶ 49]  As a result, on November 8, 2021, Plaintiff requested leave under the Family Medical Leave Act ("FMLA"), which was approved.  [*Id.* at ¶ 50]  This leave ended on November 29, 2021 and Plaintiff returned to the classroom.  [*Id.* at ¶¶ 51-52]  Three days later, Ms. Langburg came to Plaintiff's courtroom, "ostensibly to help provide him support on one of his first days back in the classroom."  [*Id.* at ¶ 52]  Afterward, Ms. Langburg sent Plaintiff a text and email telling him that his lesson was "bad."  [*Id.* at ¶ 53]

DPS's failure to discipline and/or remove the complaining students resulted in Plaintiff's medical conditions worsening.  [*Id.* at ¶¶ 41-43, 54]  On December 8, 2021, Plaintiff had another stress-induced seizure while at work.  [*Id.* at ¶ 55]  The next day, Plaintiff and his attorney met with Ms. Shearer, Ms. Crouch, Christin Sahm-McKee (a DPS human resources officer), and DPS's in-house counsel.  [*Id.* at ¶ 56]  Plaintiff provided DPS with the medical certification form and requested unspecified "reasonable accommodations."  [*Id.* at ¶ 56]  Hamilton denied the accommodations request.  [*Id.* at ¶ 57]

"Without [DPS] intervention, students continued to torment and harass [Plaintiff]."  [*Id.* at ¶ 58]  On December 10, 2021, Kaiser Permanente Lakewood Primary Care wrote

5

a letter regarding the impact Plaintiff's employment situation was having on his physical health.  [*Id.* at ¶ 59]  According to the letter:

> The stress of the unresolved situation at Hamilton [was] exacerbating [Plaintiff's] epilepsy, as he continues to have stress induced seizures at an untypical rate.  [D]ue to his disability of Autism, [Plaintiff] is struggling to regulate and manage the high level of stress caused by the inaction of the school to adjust [Plaintiff's] teaching assignment to ensure he does not have to work daily with the students who made the false allegations against him.

[*Id.*]  The letter further recommended that Plaintiff be placed in a teaching position at a school other than Hamilton and identified an opening at George Washington High School.  [*Id.*]  Despite this recommendation, DPS did not reassign Plaintiff from Hamilton.  [*Id.* at ¶ 60]

On December 13, 2021, Plaintiff led his class outside for a fire drill.  [*Id.* at ¶ 61]  He directed his students to line up by a fence, stating: "Mr. Gile's class by the fence."  [*Id.*]  A student from one of his classes yelled: "You mean Mr. Pedophile's class?"  [*Id.*]  Plaintiff, upset by the comment, spoke with Assistant Principal Amber Shearer and asked to have that student removed from his class.  [*Id.*]  Though Ms. Shearer assured Plaintiff that the student would be removed from his class, the student was never removed.  [*Id.* at ¶¶ 61-62]

On December 14, 2021, Plaintiff had another stress-induced seizure at work.  [*Id.* at ¶ 63]  During the seizure, Plaintiff nearly fell down the stairs.  [*Id.*]  That day, Plaintiff met with Ms. Doyle and Joel Wally, another DCTA representative.  [*Id.* at ¶ 64]  Together, they created another list of proposed accommodations and sent an ADA request to DPS.  [*Id.*]  Specifically, Plaintiff requested that the student who wrote the petition be removed from Plaintiff's classroom.  [*Id.*]  DPS did not respond to this request and refused to remove any students from Plaintiff's classroom.  [*Id.* at ¶ 65]

During winter break, students continued to harass Plaintiff. [*Id.* at ¶¶ 66-67] Plaintiff immediately informed Hamilton administrators and told them that he did not feel safe returning to school. [*Id.* at ¶ 68] He requested that DPS respond to his December 14 ADA request and transfer Plaintiff to a DPS high school. [*Id.*] DPS refused these requests. [*Id.* at ¶ 69]

When the school year resumed following winter break, students' schedules changed. [*Id.* at ¶ 70] Nonetheless, Hamilton and DPS refused to remove any students from Plaintiff's classroom. [*Id.*] Meanwhile, Plaintiff's mental and physical health continued to rapidly deteriorate. [*Id.* at ¶ 71] And on January 10, 2022, Plaintiff had another stress-induced seizure. [*Id.* at ¶ 72]

On January 12, 2022, Plaintiff applied for Worker's Compensation leave and filled out the FMLA paperwork. [*Id.* at ¶ 76] He was put on FMLA leave in the middle of January. [*Id.* at ¶ 77] On January 25, 2022, Plaintiff arranged to begin mental health treatment. [*Id.* at ¶ 78] Three days later, Plaintiff had an appointment with a neurologist who mandated that Plaintiff be put on leave for the rest of the school year. [*Id.* at ¶ 79]

While Plaintiff was on leave, DPS finally approved an administrative transfer for Plaintiff. [*Id.* at ¶ 82] Plaintiff started the 2022-2023 school year at another school, but by that point his health had deteriorated to the point where he was again required to go on medical leave. [*Id.* at ¶ 83] Plaintiff eventually had to undergo surgery to help reduce the number and severity of his seizures. [*Id.* at ¶ 84] And because he had used all of his allotted leave, he was forced to resign from his position with the possibility of reinstatement when he is medically cleared to teach. [*Id.* at ¶ 85]

On December 20, 2023, Plaintiff initiated this action. [#1] On April 4, 2024, Plaintiff filed his operative Amended Complaint. [#17] The Amended Complaint brings three claims: (1) violation of Section 504 of the Rehabilitation Act ("RA") [*id.* at ¶¶ 88-96]; (2) violation of the ADA [*id.* at ¶¶ 97-105]; and (3) violation of the Colorado Anti-Discrimination Act ("CADA")[2] [*id.* at ¶¶ 106-114]. Defendants filed the instant Motion on April 22, 2024. [#21] Plaintiff has responded to the Motion [#22] and Defendants have replied [#23].

## II.   STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a motion under Rule 12(b)(6), a court must "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff." *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (alteration in original) (quoting *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)). Nonetheless, a plaintiff may not rely on mere labels or conclusions, "and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). Plausibility refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *Robbins v. Oklahoma*, 519 F.3d 1242,

---

[2] Plaintiff has since abandoned his CADA claim. [#22 at 2 n.1] Thus, to the extent the Motion seeks to dismiss the CADA claim, the Motion is GRANTED.

1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570). "The burden is on the plaintiff to frame a 'complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief." *Id.* (quoting *Twombly*, 550 U.S. at 556). The court's ultimate duty is to "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007).

### III. ANALYSIS

Plaintiff asserts federal claims for violations of the ADA and the RA. [#17 at ¶¶ 88-105] Title II of the ADA states, in pertinent part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "Analysis of a claim under Title II of the ADA is identical to an analysis under the Rehabilitation Act." *Kimble v. Douglas Cty. Sch. Dist. RE-1*, 925 F. Supp. 2d 1176, 1182 (D. Colo. 2013) (citing *Nielsen v. Moroni Feed Co.*, 162 F.3d 604, 608 n.7 (10th Cir. 1998); *see also Anderson v. Colo. Dep't of Corr.*, 848 F. Supp. 2d 1291, 1300 n.2 (D. Colo. 2012) ("The Rehabilitation Act is materially identical to and the model for the ADA[—]the elements are the same except the Rehabilitation Act requires that defendant receive federal funds." (quotations omitted)). Accordingly, the Court analyzes the ADA and RA claims together.

"To state a claim under Title II, the plaintiff must allege that (1) [he] is a qualified individual with a disability, (2) who was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, and (3) such exclusion, denial of benefits, or discrimination was by reason of a disability." *Robertson v. Las Animas Cty.*

*Sheriff's Dep't*, 500 F.3d 1185, 1193 (10th Cir. 2007). "Based on the second element, courts have recognized two types of claims: (1) exclusion from denial of benefits and (2) discrimination." *J.V. v. Albuquerque Pub. Sch.*, 813 F.3d 1289, 1295 (10th Cir. 2016). "Courts have recognized three ways to establish a discrimination claim: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation." *Id.* Plaintiff's ADA and RA claims are premised on Defendant's alleged failure to make a reasonable accommodation. [#17 at ¶¶ 88-105]

A failure to accommodate claim is evaluated under a modified *McDonnell Douglas*[3] burden shifting framework. *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1204 (10th Cir. 2018). "Under the first step of the modified framework, a plaintiff must demonstrate that (1) [he] is disabled; (2) [he] is otherwise qualified; and (3) [he] requested a plausibly reasonable accommodation." *Id.* (quotation omitted). "If the plaintiff makes a showing on all three elements, the burden shifts to the employer to present evidence either (1) conclusively rebutting one or more elements of plaintiff's prima facie case or (2) establishing an affirmative defense." *Id.* (quotation omitted).

Defendant first argues that Plaintiff fails to plausibly plead that he is "qualified." [#21 at 8-9] A "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). According to Defendant, Plaintiff was not qualified due to the frequency and severity of his seizures and the fact that he was not cleared by his doctors to return to work. [#21 at 9] The problem with Defendant's argument, however, is that Plaintiff alleges that his seizures and increased physical and

---

[3] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

mental health problems all resulted from Defendant's failure to initially provide Plaintiff's requested accommodation—removing the accusing students from Plaintiff's classroom. [#17 at ¶¶ 45, 48-49, 54, 57, 60, 61-62, 67-68, 71]  The Complaint plausibly alleges that Plaintiff's medical problems stemmed from Plaintiff having to teach the students who had accused him (and continued to ridicule him), and that had DPS initially accommodated Plaintiff by removing these students from Plaintiff's classroom, Plaintiff would have been qualified to teach.  [*Id.*]  And Defendant cannot use the fact that Plaintiff became unqualified as a result of Defendant's failure to accommodate as a basis to argue that Plaintiff was not a qualified individual.  *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 418 (6th Cir. 2020) (defendant could not argue that the plaintiff's absenteeism demonstrated that he was not a qualified individual when it was the failure to accommodate that caused the absenteeism).

Defendant also argues that, due to his medical condition, Plaintiff posed a direct threat to the workplace.  [#21 at 9-10]  "Under the ADA it is a defense to a charge of discrimination if an employee poses a direct threat to the health or safety of himself or others."  *Borgialli v. Thunder Basin Coal Co.*, 235 F.3d 1284, 1290 (10th Cir. 2000).  "The term 'direct threat' means a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation."  42 U.S.C. § 12111(3).

According to Defendant, Plaintiff alleges that he nearly fell down the stairs due to a seizure and, as a result, he was a direct threat to himself or others and his condition rendered him unable to maintain his personal safety in the workplace, much less supervise students.  [#21 at 10]  The Court disagrees.  The incident referred to by Defendant occurred on December 14, 2021, approximately six weeks after Plaintiff

11

requested that the accusing students be removed from his classroom. [#17 at ¶ 63] And as explained above, Plaintiff alleges that his seizures and increased physical and mental health problems all resulted from Defendant's failure to initially provide Plaintiff's requested accommodation. [*Id.* at ¶¶ 45, 48-49, 54, 57, 60, 61-62, 67-68, 71] Thus, Plaintiff plausibly alleges that, had Defendant promptly provided Plaintiff's requested accommodation, Plaintiff would not have been a direct threat.

Finally, Defendant argues that it provided Plaintiff reasonable accommodations. [#23 at 10-15] "A district court's estimate of what is reasonable rests in large part upon factual determinations, and [t]he fact-specific nature of a reasonable accommodation analysis often renders such an analysis inappropriate at the motion to dismiss stage." *Griego v. Kohl's, Inc.*, No. 21-cv-00045-RM-NYW, 2021 WL 4947286, at *8 (D. Colo. Sept. 27, 2021), *report and recommendation adopted*, No. 1:21-cv-00045-RM-NYW, 2021 WL 5230873 (D. Colo. Oct. 19, 2021) (quotation omitted). "For this reason, courts regularly decline to rule whether an accommodation is or was reasonable at the motion-to-dismiss stage." *Id.* (collecting cases). Here, Plaintiff alleges that he asked that the accusing students be removed from his classroom, that DPS routinely moves students from one teacher's classroom to another teacher's classroom for a variety of reasons, including conflict between teachers and students, and that DPS had multiple teachers who taught the same subject matter as Plaintiff. [#17 at ¶¶ 27, 32-33] Given these facts, and the fact-specific nature of a reasonable accommodation analysis, the Court cannot conclude at this stage that Plaintiff's request that the accusing students be transferred to another classroom was unreasonable.[4] Accordingly, the Court concludes that, at this stage,

---

[4] Defendant argues that it could not discipline the accusing students because retaliation against a person complaining of sex discrimination violates Title IX. [#21 at 12-13] And

Plaintiff has plausibly pled the availability of reasonable accommodations that Defendant denied.[5]

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss [#21] is **GRANTED** to the extent it seeks to dismiss Plaintiff's CADA claim but **DENIED** to the extent it seeks to dismiss Plaintiff's ADA or RA claim. This matter is set for status conference on November 6, 2024, at 9:00 a.m., at which time the parties shall be prepared to discuss new case deadlines.

DATED: September 30, 2024                         BY THE COURT:

                                                  s/Scott T. Varholak
                                                  United States Magistrate Judge

---

Defendant may be correct to the extent Plaintiff argues that a reasonable accommodation required DPS to refer students to the disciplinary office or the police. But it is not clear that removing the students from Plaintiff's classroom and placing them in another classroom would constitute retaliation, especially given that the accusing students clearly did not like Plaintiff and may have preferred being in another classroom.

[5] Because the Court concludes that Plaintiff has plausibly pled that the transfer of the accusing students was a reasonable accommodation, the Court need not address whether transferring Plaintiff to another school was a reasonable accommodation or whether Defendant unreasonably delayed in providing that accommodation.